UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

WILLIE CARL JONES                     CIVIL ACTION NO. 14-cv-2734

VERSUS                                JUDGE HICKS

N. BURL CAIN, ET AL                   MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

A Bossier Parish jury convicted Willie Carl Jones, Jr. ("Petitioner") of two counts of second degree murder, and the court sentenced him to consecutive life sentences. The verdicts and sentences were affirmed on direct appeal. State v. Jones, 81 S.3d 236 (La. App. 2d Cir. 2011), writ denied, 88 So.3d 462 (La. 2012). Petitioner also pursued a postconviction application in state court.

He now seeks federal habeas corpus relief on several grounds. Petitioner's initial filing was 875 pages. The court denied Petitioner's request to exceed the ordinary page limits and allowed him to re-file no more than 250 pages. Doc. 8. Petitioner then filed an amended petition, which outlined his claims, that with exhibits totaled 218 pages. Doc. 12. He was also allowed to file a memorandum in support (Doc. 21) that was 87 pages, bringing the total to 305 pages. The court allowed the unduly lengthy filing and has looked to the memorandum as the best articulation of Petitioner's claims. For the reasons that follow, it is recommended that his petition be denied.

## Sufficiency of the Evidence

### A. Relevant Evidence

The first victim was Mark Lioy, a laborer who cashed his $600 paycheck at a store in Shreveport on Friday, March 20, 2009. Lorrie Lee Phillips testified that she often met Lioy at the store on Friday afternoons, and they would use drugs and have sex together. She testified that she saw Lioy cash his check around 5:30 p.m., and he gave her $20. Phillips testified that Lioy got into a car with two people: Petitioner, whom she knew as a drug dealer, and Amy Foster, who was a prostitute and drug user. Lioy told Phillips that he would be back in 30 or 45 minutes, but she never saw him again.

Surveillance video in a Shreveport pawn shop showed that Petitioner, Lioy, and Foster made a visit to the shop and left at about 6:00 p.m. Detective Cortez Bridges testified as an expert in cell phone data recovery. He explained that cell towers are divided into three or more sectors, which allowed him to determine that a cell phone was within a pie shaped sector adjacent to a particular tower when it placed or received a call or text. He testified that the phone records from Petitioner, Lioy, and Foster showed that they were together in the Highland area of Shreveport on that Friday afternoon, and they then traveled across the Red River to Bossier Parish, and then to an area near Lake Bistineau. Petitioner's phone was noted to be in the Sligo Road area at 6:11 p.m. That road is along the route to where Lioy's body was found. Amy Foster's phone records showed that she received a call at 6:40 p.m., while she was in sector one of the Camp Joy Road cell tower, which placed her near the Jerusalem Cemetery Road.

Later that evening, Lioy's body was found off Jerusalem Cemetery Road near Lake Bistineau. He had been shot several times, including once in the right temple, once in the back, and in the hands and arms. He did not have a wallet, cell phone, or ID of any kind on him. Police used his fingerprints to identify the body.

The final calls made from Mark Lioy's phone were at 6:28 p.m. and came from sector one of the Camp Joy Road cell tower, which included the area where his body was found. Lioy's phone had placed three calls to Amber Thorn, a Shreveport woman who testified that she did not know Lioy but admitted that she knew Amy Foster and Petitioner, and she sometimes bought drugs from Petitioner. Detective Bridges theorized that Petitioner took Lioy's phone and made the three calls to Amber Thorn. He also testified that Petitioner's phone records showed that Petitioner was back in the Highland area in Shreveport by 8:45 p.m., which allowed ample time for him to have driven the 28-minute trip from the pawn shop to the Bossier murder site and then return to Shreveport.

Amber Thorn testified that Petitioner had asked her, a few days earlier, if she was "down for getting some money." She said yes, but asked what he meant. Thorn said that Petitioner replied that they were going to "get Mark" and they were "going to kill him." Thorn said she did not want to hurt anyone, but Amy Foster said, "Well, I'll do it. I'm down for anything." Thorn also testified that Petitioner told her that Lioy owed him money for "drug fronts." The defense argued that this testimony lacked credibility because Thorn gave statements to the police but never mentioned this until she testified at a pretrial hearing.

Bossier deputies contacted Lioy's friends and family and attempted to retrace his steps. They learned from Ms. Phillips that Lioy had left in a car with Petitioner and Amy Foster. They also found a red Mitsubishi that Petitioner often drove. It was parked by a shack near Stoner Avenue in Shreveport's Highland neighborhood. The occupants of the shack were Amber Thorn and her aunt, Sheila Horton. The women told the deputies that Petitioner had left his car there and borrowed Horton's car. Horton testified that she was friends with Amy Foster and sometimes allowed Petitioner, who was Foster's boyfriend, to borrow her car if his car was having trouble.

Early Monday morning, March 23, the women agreed to follow the deputies to a Shreveport police station for questioning. On the way to the station, Amber Thorn tried to call Amy Foster, but she got no answer. She called Petitioner and told him the police wanted to question him about a murder. Petitioner said, "Oh, shit" and hung up. Petitioner's cell phone records indicated that he was near downtown Shreveport and I-20 when he was on this call at 3:48 a.m. Monday They also showed that he received a call from Amber Thorn that went to his voice mail at 3:58 a.m., and he had by then traveled across the Red River to Bossier City, near the riverside neighborhood known as Old Bossier. That neighborhood includes Wyche Street.

At 3:59 a.m., ten minutes after Amber alerted Petitioner that police wanted to speak to him, Bossier City police received a report of gunshots fired in the area of Wyche Street. Detective Brian Griffith testified that a patrol officer went to the area, but it was dark and the officer did not have a specific address. He did not see anything unusual. Three hours later,

around 7:00 or 7:30 a.m., a passerby reported a body lying in front of a house on Wyche Street in Old Bossier. It was Amy Foster. She had been shot five times, including once in the face and twice in the chest, and she was stabbed four times. Griffith testified that some Mexican residents lived in both sides of the duplex where the body was found, but they had no information about the shooting. Several neighbors said they heard gunshots, and some said they heard a man and woman arguing.

There were no calls of gunfire reported between the 3:59 a.m. call and the discovery of Amy Foster's body. Just as with Mark Lioy's body, Foster's body had been stripped of all forms of ID or valuables. She was identified because police knew Foster was likely a witness to the murder of Mark Lioy and could be in danger. Their hunch was correct.

At around the time the shots were reported, Bossier deputies were at a Shreveport police station interviewing Amber Thorn and Sheila Horton about Mark Lioy's murder. They were not aware of the events that were unfolding in Bossier with respect to Amy Foster. At the request of the deputies, Thorn tried to call Amy Foster at 4:19 a.m. but got no answer. She called Petitioner and asked him to bring Horton's car to them, and she said again that police wanted to talk to him about a murder. Sheila Horton also called Petitioner and demanded that he meet her at a store to return her car. Petitioner arrived at the store at 4:50 a.m. driving Horton's Toyota Camry. Police were waiting there for him, and he followed them to the police station. His phone records showed that he left the Old Bossier area at 4:00 a.m. and drove west to Shreveport, eventually arriving at the police station.

Petitioner told the deputies that he and Amy Foster had met Mark Lioy around 5:30 p.m. on Friday. Petitioner admitted taking the two to the pawn shop. He claimed they next went to a skateboard park on Clyde Fant Parkway, where Ms. Foster turned a trick with Lioy, and Petitioner dropped Lioy off, at Lioy's request, in Shreveport near Youree Drive at Stoner Avenue. Petitioner said he never saw Lioy again.

Petitioner told police that he and Amy Foster then went to Petitioner's mother's home near Byrd High School in Shreveport, later rented a motel room on North Market Street, and then to a house on Trichel Street in Bossier Annex, where a group of Mexican migrant workers was staying. Petitioner said he left Foster there, where she was going to perform prostitution work. Sheila Horton testified that when she called Petitioner at the request of the police to ask for the return of her car, Petitioner asked what he was supposed to do with Amy, who he had dropped off at "the Mexicans' house." Horton said she did not know, but she needed her car. Horton said she herself had dropped off Amy at two different houses in Bossier to turn tricks with Mexican men, one of them being where her body was found and the other "off of Barksdale Boulevard and Delhi."

At about 7:00 a.m. Monday, the deputies had Petitioner take them to the house on Trichel Street where he said he left Amy. Trichel Street is off of Barksdale Boulevard, which is very long, but it is not near Delhi Street. They found a group of Mexican workers. Detective Joey Cleveland testified that they found six or seven men sleeping on the floor of the dark home. One of the men was able to communicate in broken English and indicated that he knew Amy and also knew a black man with glasses named Willie Jones. Crawford

testified, "And I said Willie Jones and, yes, he definitely knew who Willie Jones and Amy Foster were. They had been there before." But the deputies found no sign of Ms. Foster in the house or indication she had been there recently.

The deputies searched the motel room on North Market Street and found no evidence related to Foster or Lioy. They released Petitioner about 7:30 a.m. The deputies later learned that the body of Amy Foster had been found on Wyche Street, about two and one-half miles from the migrant worker house on Trichel Street where Petitioner said he dropped her off. Petitioner's phone records placed him in the area where Amy's body was found, but no calls placed him in the Trichel Street area that night or morning.

Amy Foster's phone records showed that she returned to the Highland area of Shreveport the Friday night that Mark Lioy was killed. On the Monday morning, that Foster was killed, her phone received a call from Sheila Horton that went to voice mail at 4:19 a.m., soon after it is believed she was killed. Records indicated that Amy's phone was then in the area of the I-20 corridor of Shreveport and connecting to a cell tower on Greenwood Road. That was a fair distance from where her body was found in Bossier City. Petitioner's cell records showed that, soon after leaving Bossier at 4:00 a.m., he drove to Shreveport. Police directed Sheila Horton to call Petitioner just seconds after her unsuccessful 4:19 a.m. call to Amy, and Petitioner's phone connected to the same Greenwood Road cell tower. The prosecution argued that this suggested Petitioner had taken Amy's cell phone after he killed her.

Deputies obtained a warrant to search Petitioner's mother's house, as well as any motor vehicles on the premises. They searched Petitioner's car, a Dodge Intrepid, that was parked on a vacant lot next door. In the spare tire well in the trunk of the car they found a plastic bag holding six rounds of .357 Magnum semi-wadcutter cartridges.

Richard Beighley, a forensic analyst with the Crime Lab testified that the ammunition found in Petitioner's car was consistent with the badly deformed bullets recovered from Lioy's body, and they were similar to bullets recovered from Foster's body. The rounds found in the bodies were fired from either a .38 or .357 Magnum caliber weapon, both of which fire the same size projectile/bullet. Both victims were shot with a weapon with a left-hand twist rifling in the barrel, which is less common than right-hand twist. Beighley could not say, without a weapon to test, if both victims had been shot with the same firearm, but the bullets in the bodies were consistent with being fired from the same weapon.

The investigators found no other physical evidence to link Petitioner to either murder. They did not recover a weapon that might have fired the bullets or the cell phones or other personal effects that belonged to the victims. There were no fingerprints or DNA from Petitioner found on either body, nor was there any blood or DNA evidence recovered from the car that Petitioner was driving. No eyewitness testified that Petitioner killed either victim. The State did call two witnesses, Benito Vasquez and Marcus Lige, who were in jail with Petitioner. Lige testified that Petitioner came to him for legal advice and admitted that he had killed the two victims. Vasquez refused to testify against Petitioner at trial, but the

prosecutor played Vasquez's prior recorded statement in which Vasquez said that Petitioner admitted that he killed the victims.

## B. Analysis

Petitioner was charged with the second-degree murder of each victim. Louisiana law defines second-degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, or when the offender is engaged in the perpetration or attempted perpetration of certain felonies, including armed robbery. La. R.S. 14:30.1. In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The state appellate court assessed the sufficiency of the evidence on direct appeal. It reviewed the evidence in detail and set forth the Jackson standard. The court noted that the direct evidence with respect to Mr. Lioy showed that Lioy received a $600 paycheck on the afternoon before his death, and Lorrie Lee Phillips testified that he cashed that check and got in a car with Petitioner and Amy Foster. Video surveillance showed that the three visited a pawn shop that evening and left together.

The appellate court admitted that, beyond this evidence, the evidence was circumstantial. The bullets found in Petitioner's car were merely consistent with those that shot Lioy; bullets found in other homes or cars could be just as consistent. Amber Thorn testified that Lioy owed Jones money for drugs, but none of the valuables taken from Lioy's body were found in Petitioner's possession. However, cell phone records showed that the three people in Lioy's group traveled to the area where his body was found, and nobody ever saw Lioy alive after he left the pawn shop with Petitioner and Amy Foster. There was also Thorn's testimony that Petitioner told her, a few days before the murder, that he planned to kill Lioy.

The appellate court determined that the direct and circumstantial evidence taken together was sufficient under Jackson to allow a jury to find beyond a reasonable doubt that Petitioner killed Lioy with a specific intent either to kill or inflict great bodily harm. The court admitted that the evidence might not support a prosecution theory that required a showing of armed robbery, but that was not necessary.

Turning to Amy Foster, the appellate court noted that she was the only person other than Petitioner who might have known the facts of Lioy's murder. When Amber Thorn called Petitioner and told him that the police wanted to talk to him about a murder, citizens reported hearing gunfire in old Bossier about 10 minutes later. Cell phone records showed that Petitioner was in that area at the time. Petitioner gave a statement to police and admitted that he was with Foster until shortly before her death, but he claimed that he dropped her off in Bossier Annex, a place where the cell phone records did not place him. Amy Foster's

body was found in old Bossier, the same area where shots were reported earlier that morning. Phone records showed that both Petitioner's phone and Foster's phone were in Shreveport and connecting to the same sector and tower not long after the report of shots fired. That was inconsistent with Petitioner leaving Foster in Bossier and consistent with him killing her and taking her phone to dispose of it. The court found the circumstances sufficient to allow a rational juror to find beyond a reasonable doubt that Petitioner intentionally murdered Amy Foster to keep her from implicating him in Lioy's murder.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews,132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015).

Petitioner argues that Louisiana law requires that in prosecutions that rely on circumstantial evidence the evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. To the extent the statute imposes a heavier burden than Jackson, the federal court need not consider it on federal habeas review. Williams v. Cain, 408 Fed. Appx 817,

821 (5th Cir. 2011), citing Schrader v. Whitley, 904 F.2d 282, 284 (5th Cir.1990) (noting that "in challenges to state convictions under 28 U.S.C. § 2254, only Jackson need be satisfied, even if state law would impose a more demanding standard of proof"). "Either direct or circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction." Schrader, 904 F.2d at 287.

A reasonable argument could be made to the jury, and it was, that the largely circumstantial evidence was not sufficient to prove guilt beyond a reasonable doubt. The jury, by a 10-2 vote, was not persuaded and found that the evidence was sufficient. The state appellate court has now reviewed that verdict under Jackson, which holds that it is "the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). The appellate court was persuaded, after careful review, that the jury's verdict was supported by sufficient evidence.

This court's review of that decision is limited to asking whether the state court's decision was an objectively unreasonable application of that deferential Jackson standard. There is room for reasonable disagreement among jurors in how to assess the evidence, but once the verdict was entered, the evidence was sufficient to withstand review under Jackson. A reasonable jurist might take issue with that conclusion, but once the state court made its decision, it could not be said to be so wrong as to be an objectively unreasonable application of Jackson. Habeas relief is not warranted on the sufficiency of the evidence claims.

**Motion to Suppress**

Police obtained a warrant to search the home and any vehicles at 714 Kings Highway, where Petitioner lived with his mother. Petitioner's car, where the bullets were found, was parked next door at 716 Kings on a vacant lot owned by someone else. Defense counsel filed a motion to suppress on the grounds that the search exceeded what was permitted by the warrant. The district court denied the motion, and the state appellate court affirmed. It noted that the layout of the two lots supported the officer's reasonable inference that the car was parked on a portion of the property described in the warrant.

Petitioner seeks habeas review of that decision, but a federal habeas court is generally barred from reviewing Fourth Amendment claims. Stone v. Powell, 96 S.Ct. 3037 (1976). In Stone, the Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 96 S.Ct. at 3037. To satisfy the "opportunity for full and fair litigation" requirement, the state need only provide the processes whereby a defendant can obtain full and fair litigation of a Fourth Amendment claim. Stone bars federal habeas consideration of that claim whether or not the defendant employs those available processes. Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002).

Louisiana law allowed Petitioner an opportunity for full and fair litigation of his Fourth Amendment claim, and he took advantage of that opportunity by filing a motion to

suppress. The state courts ruled on the motion. There is no grounds to challenge that decision in this habeas petition.

**Juror Misconduct**

Near the end of the trial, a juror reported to the bailiff that she overheard some of the other jurors talking about the case. Judge John Robinson alerted counsel and asked the juror to tell exactly what she heard. The juror stated that, before court began that morning, one of the young ladies on the jury said that she was "disturbed by what she had saw on the video, all the blood and gore." Another said that she could not look at it and that it really upset her. The reporting juror said that she overheard one woman say, "My husband and I was talking and I told him that - - what I saw on - - in the court. I can't sleep, you know the blood and stuff, and the head opening I saw on TV in the court. I can't sleep. I haven't been sleeping." The reporting juror said she then left the area where she overheard the conversation. Tr. 967-71.

Neither the prosecutor nor defense counsel had any questions for the reporting juror. Defense counsel had asked earlier, before hearing from this juror, to be able to speak to the persons who participated in the conversation. The judge said that the only potential violation he heard was about one juror talking to her spouse. He did not think it rose to the level to require more than an admonishment, and it did not require examination of any of the other jurors. Tr. 972. He then strongly admonished the entire jury not to discuss the case in any way "among yourselves or with anyone at home, including spouses, significant others, or any

friends ... ." He also told the jurors that if there had been any such discussions that they were to completely disregard them. Tr. 978-79.

Petitioner complained on direct appeal, as he does in his habeas petition, that the court erred in denying a mistrial or failing to further inquire into possible external influences. The appellate court noted that the reporting juror did not see which jurors were talking when she overheard them, which complicated any further inquiry. There was also no report of a discussion of the details of guilt or innocence or any attempt by a juror to influence others. One of the jurors apparently told her husband that the evidence was gory and caused her to lose sleep, but there was no evidence that the husband or other source attempted to influence the juror about her view of the case. The appellate court found no showing of influence and no abuse of discretion by the trial judge. State v. Jones, 81 So.3d at 248.

The Sixth Amendment guarantees the accused the right to a trial by an impartial jury, and the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence. Oliver v. Quarterman, 541 F.3d 329, 336 (5th Cir. 2008). Ordinarily, private contact or communication with a juror during a trial about the matter before the jury is presumptively prejudicial. Remmer v. U.S., 74 S.Ct. 450 (1954). But in the habeas context, the federal court defers to a state court's factual finding that there was no improper jury contact unless the petitioner presents clear and convincing evidence to the contrary. Oliver, 541 F.3d at 342, quoting 28 U.S.C. § 2254(e)(1). The habeas petitioner is not entitled to relief based on improper third-party contact with the jury unless

the error had a substantial and injurious effect or influence in determining the verdict. <u>Ward</u> <u>v. Stephens</u>, 777 F.3d 250, 268 (5th Cir. 2015).

The trial judge made a careful inquiry into the possibility of influence and found none. One juror said she talked to her husband about the gore, but there was no evidence they spoke about the issues before the jury. Trial judges have broad discretion in how to address such matters, and a reasonable approach was taken in this case. Petitioner has not shown that the Constitution compelled further examination of other jurors in these circumstances or that there was any improper contact that had a substantial and injurious effect or influence on the verdict.

## Postconviction Decisions

Most of the remaining claims were presented to the state court in a postconviction application. Tr. 1115. The trial court issued a written decision that (1) denied all claims of ineffective assistance of counsel as procedurally improper on a postconviction application, (2) denied all claims based on errors of the trial court on the grounds they were fully litigated on appeal, and (3) denied all claims of prosecutorial misconduct on the grounds they were procedurally improper and because nothing in the record indicated they "bear any truth." Doc. 12-2, pg. 30-33.

The appellate court granted a writ in part and remanded for consideration of the <u>Strickland</u> claims, which are cognizable on postconviction review. Tr. 1711. The trial court then issued a lengthy decision that addressed each of the remanded claims. Tr. 1713-38. Petitioner returned to the appellate court, which denied relief with a summary order: "Upon

the showing made, the writ is hereby denied." Tr. 1771. The Supreme Court of Louisiana denied writs without comment each time Petitioner sought relief from that court. Tr. 1778 and Doc. 12-3, pgs. 37-39.

This court must defer to the decision of the state court on any claim that was "adjudicated on the merits" in state court within the meaning of § 2254. To determine whether the state court adjudicated the merits of a federal claim, the federal court looks to the "last reasoned state-court opinion." Ylst v. Nunnemaker, 111 S.Ct. 2590 (1991); Robinson v. Louisiana, 606 Fed. Appx. 199, 203 (5th Cir. 2015). In this case, the reasoned decisions came from the trial court, so those are the decisions that will be referenced below as the state court's decision.

**False Testimony: Amber Thorn**

Amber Thorn testified that she and her aunt were arrested as material witnesses, and she was held for 31 days. The prosecutor asked if she had been picked up on a burglary, robbery, or cocaine charge, and Thorn said she "never had any kind of charges." Thorn said the 31 days detention did her good because she had been sober since and was pursuing education and employment.

Petitioner argued in his postconviction application that the State knowingly used perjured testimony when it allowed Thorn to say she was not facing any charges because she was "a primary suspect" in the robbery of Mark Lioy. The Due Process Clause of the Fourteenth Amendment forbids the prosecution to knowingly to use, or fail to correct, perjured testimony. Giglio v. U.S., 92 S.Ct. 763, 766 (1972); Napue v. Illinois, 79 S.Ct.

1173, 1178-79 (1959). To prove that the prosecution has denied him due process of law by relying on perjury, a petitioner must prove that (1) a witness for the state testified falsely; (2) the state knew the testimony was false; and (3) the testimony was material. Knox v. Johnson, 224 F.3d 470, 477 (5th Cir. 2000), citing Giglio, supra.

The state trial judge ruled that these allegations by Petitioner were "patently false and contrary to the court record" that did not show Thorn had been charged with any crime in this case. Tr. 1733. Petitioner cites to offense reports that list Thorn's name along with every other person who had knowledge of the crimes. Being listed in an investigative report is a long way from being arrested or formally charged with a crime. The state court's rejection of this claim was supported by the facts and was a reasonable application of federal law.

**Postconviction Errors**

Petitioner's postconviction application included claims of prosecutorial misconduct based on the alleged solicitation of perjured testimony from Amber Thorn, failure to correct false testimony from Detective Brian Griffith, conspiring to deter witnesses from testifying, and erroneously admitting testimony from Benito Vasquez. The trial court held that prosecutorial misconduct was not an acceptable ground for an application under the Louisiana postconviction rules. In the alternative, the claims were rejected because "nothing in the record indicates the accusations made by Petitioner in his application bear any truth." The state appellate court remanded for assessment of some ineffective assistance of counsel claims but did not grant any relief with respect to the prosecutorial misconduct claims.

Petitioner seeks federal habeas relief on the grounds that the state court denied his prosecutorial misconduct claims without addressing them on the merits, which he argues was based on a misinterpretation of Louisiana postconviction procedural law. The claim lacks merit because the state court did offer an alternative summary denial of the claims for lack of support. Furthermore, the federal habeas court does not sit to correct procedural errors alleged to have happened in the postconviction process. Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001) ("[I]nfirmities in State habeas proceedings do not constitute grounds for relief in federal court."); Vizcarra v. Reagans, 600 Fed. Appx. 942, 943 (5th Cir. 2015) (same). See also Estelle v. McGuire, 112 S.Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

**False Testimony: Benito Vasquez**

The prosecutor called Benito Vasquez (Tr. 863), who had been housed in the same jail with Petitioner. The prosecutor established that Vasquez had given a statement to Detective Griffith months earlier during the investigation. But at trial, with his release date only days away, he refused to testify. Vasquez said he made up his earlier statement based on things he had seen in the media, all as part of an effort to get out of jail. The prosecutor played a recording of the interview.

Vasquez said during the interview that Petitioner had talked to him a few times about Petitioner's case. Doc. 2-10, pp. 78-79 and Doc. 2-11, pp. 1-17. Vasquez said that Petitioner told him the male victim (Lioy) had been buying crack from him on credit, owed him money, and had been avoiding his calls. Petitioner used Amy Foster to make contact with Lioy, after

which Petitioner drove Lioy to a rural area near a cemetery and killed him with a revolver that Vasquez believed was a .357 caliber. Vasquez said that Petitioner told him he used the same ammunition that was found in his car to murder Lioy and Foster. Vasquez said that Petitioner told him he made Lioy empty out his pockets before he shot him. Petitioner also reportedly said that a girl who bought drugs from him, and who had testified at a hearing that Petitioner asked her to help him kill someone, had called Petitioner after the Lioy shooting and told him not to trust Amy Foster. Petitioner allegedly told Vasquez that he then thought he needed to clean up the mess, so he drove to an area in Bossier where he had dropped off Foster earlier. Vasquez could not recall the street, but he knew the area and mentioned Wyche Street as a possibility. He said Petitioner told him that he waited until Foster came out of the house, shot her first from the car, then got out and shot her several more times. He then drove to Shreveport and, along the way, threw the gun in the Red River.

Vasquez also said in his statement that Petitioner could not be trusted and would likely kill you if you had wronged him in any way. He described Petitioner as "a pretty dangerous fellow" that he "wouldn't mess with," and he said he would try to be on the other side of town from wherever Petitioner was.

Petitioner seeks habeas relief on the grounds that the prosecutor knowingly used false testimony from Vasquez. The record does not support this claim. Vasquez's credibility may have been in doubt, but the prosecutor took the strong position that Vasquez was committing perjury when he testified at trial that he knew nothing of the murders and made up his prior statement. Tr. 869-71. The prior statement was not testimony; it was a mere prior statement

offered to impeach the courtroom denial of knowledge of the crime. There was no potential perjured testimony offered to support the convictions, so the state court's rejection of this claim was a reasonable application of federal law.

**The Indictments**

Petitioner was arrested, and a preliminary hearing was held. The court found probable cause to hold him on two counts of first-degree murder and one count of armed robbery. A grand jury soon indicted him on two counts of first-degree murder, but the prosecutor later amended the indictments to charge only second-degree murder.

Petitioner argues that the indictments are invalid because they were "based solely upon preliminary findings rather than through grand jury proceedings" and that the grand jury was not properly empaneled, nine grand jurors did not concur, and the indictments were not returned in open court. Petitioner complains that these issues ran afoul of Louisiana law. His trial attorneys filed an affidavit in the postconviction proceedings and testified that there were no grounds to quash the indictment. The state judge accepted the affidavit and denied the postconviction claim.

The grand jury requirement is applicable to federal prosecutions, but it is not binding on the states. Campbell v. Louisiana, 118 S.Ct. 1419, 1423 (1998); Hurtado v. California, 4 S.Ct. 111 (1884); and Wilkerson v. Whitley, 28 F.3d 498, 502-03 (5th Cir. 1994) (en banc). Thus, habeas relief is not available based on an argument that a state charge was not instituted by a grand jury. And Petitioner's arguments that Louisiana grand jury procedures

were not followed are not grounds for relief from his convictions. Federal habeas relief is not available for mere errors of state law. Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).

**Improper Joinder**

Petitioner argues that the two murder counts were improperly joined at one trial in violation of state procedural law and the Fourteenth Amendment right to a fair trial. The state law argument has no merit on habeas. The federal argument permits relief only if the state court's action unreasonably applied clearly established federal law, as decided by the Supreme Court. 28 U.S.C. § 2254(d)(1).

One federal court has stated that there is no clearly established federal law regarding the severance of co-defendants' trials. Barrett v. Mississippi, 2007 WL 1231813 (S.D. Miss. 2007). Petitioner has not cited any Supreme Court precedent that would mandate severance of the two murder counts in this case. Circuit level decisions emphasize that whether to grant a severance is within the sound discretion of the trial court, and habeas relief is appropriate only if the simultaneous trial of more than one offense actually rendered the trial fundamentally unfair. Breelend v. Blackburn, 786 F.2d 1239, 1240 (5th Cir. 1986); Schneider v. Davis, 2017 WL 2562232, *11 (W.D. Tex. 2017).

Petitioner argues that he could have chosen to testify regarding the murder of Amy Foster and invoked his privilege against self-incrimination on the Lioy murder if there had been separate trials. He offers nothing but a conclusory statement in this regard, and "[s]everance is not mandatory simply because a defendant indicates that he wishes to testify on some counts but not on others." Alvarez v. Wainwright, 607 F.2d 683, 685 (5th Cir.

1979).  Petitioner has not demonstrated error or prejudice that would warrant habeas relief on this claim.

**Post-_Miranda_ Silence**

Petitioner argued in his postconviction application that Detective Charles Owens and Detective Brian Griffith testified that when Petitioner was brought to their office for questioning regarding the Amy Foster homicide Petitioner refused to answer questions and said he needed a lawyer.  Petitioner argued that such testimony about his post-_Miranda_ invocation of his right to silence violated _Doyle v. Ohio_, 96 S.Ct. 2240 (1976).  The trial court accepted Petitioner's representation that the detectives made references to a request for a lawyer, but rejected the claim on the grounds the references were not used for impeachment or to argue they constituted substantive evidence of guilt.  Tr. 1736.  Petitioner makes the same claim in his habeas petition.

Petitioner was interviewed a first time and gave a statement.  A police report (Tr. 1349) shows that he was brought to the office for a second round of questioning after Amy Foster's body was found.  The report states: "He denied answering questions and said that he needed a lawyer."  That language is similar to how Petitioner describes the alleged testimony of Detectives Owens and Griffith, but a review of the trial transcript does not reflect such testimony from either man.

Detective Owens testified (Tr. 530-69) about his investigation.  He described the first interview (Tr. 548-50) and the release of Petitioner.  Tr. 551.  He described the discovery that Amy had been killed (Tr. 552) and meeting Petitioner at his mother's house for the execution

of the search warrant. Tr. 553. He described the discovery of the ammunition during the search. The prosecutor asked what he did with Petitioner at that point, and Owens said that Petitioner was taken into custody and charged with the murder of Mark Lioy. There was no mention of a second attempt at interrogation or invocation of the right to silence. Defense counsel cross-examined Owens about the statement Petitioner gave but never broached the second attempt at questioning. Tr. 568-69. Detective Griffith (Tr. 592-608) described his investigation but did not testify about any interrogation of or statements from Petitioner.

Petitioner has not cited a page number for the alleged testimony, and the court's review of the transcript does not support this claim. Given the lack of supporting evidence, the state court's denial was reasonable. This claim must be denied.

**Hearsay By Detectives**

Petitioner was driving Sheila Horton's silver Toyota Camry during the relevant times. Detective Griffith testified that, after discovering Amy Foster's body, the police did a canvas of the neighbors. He said that several witnesses said they heard some gunshots, some said they heard a man and woman arguing, and one woman said that she saw a white vehicle leave the area after the gunshots. Griffith also said that at 3:59 a.m. police received a call of shots fired in that area. Tr. 604. Detective Owens made brief reference to the "shots fired" call, but only to explain that he was not aware of it or the developments with respect to Amy Foster at the time he first spoke with Petitioner. Tr. 545-48.

Petitioner argued in his postconviction application that this was improper hearsay that deprived him of the right to confront and cross-examine the residents who claimed to have

heard shots or seen a white car leave the area. The trial court first denied the claim on procedural grounds because there had not been an objection raised at trial. Alternatively, the court denied the claim based on the rule that a police officer may refer to statements made to him by other persons to explain the sequence of events that lead to the arrest of the defendant. Tr. 1732.

"Under the Louisiana Rules of Evidence, an investigating officer may be permitted to refer to statements made to him by other persons involved in the case without it constituting hearsay if it explains his own actions during the course of an investigation and the steps leading to the defendant's arrest." Woodfox v. Cain, 609 F.3d 774, 814 (5th Cir. 2010). The hearsay exception has limits and generally will not include an explanation that involves a direct assertion of criminal activity by the accused. Id.

Of course, a habeas court cannot grant relief based merely on violation of state evidence rules. Habeas relief would be permitted only if the admission of the hearsay violated the Confrontation Clause, which bars the admission of testimonial statements of a witness who did not appear at trial unless he was unavailable and the accused had a prior opportunity for cross-examination. Crawford v. Washington, 124 S.Ct. 1354 (2004).

But a "statement that is not testimonial cannot violate the Confrontation Clause." Brown v. Epps, 686 F.3d 281, 286 (5th Cir. 2012). The Supreme Court has not given a comprehensive definition of testimonial. Some things such as former testimony and statements made in police interrogations are testimonial, but a statement given to police for the primary purpose of allowing them to assist in an ongoing emergency where the

circumstances are not to create an out-of-court substitute for trial testimony is not testimonial.  Id.; Holiday v. Stephens, 587 Fed. Appx. 767, 777 (5th Cir. 2014).  Some communications fall in the middle and have not been squarely ruled on by the Supreme Court.

The state court denied this claim on the merits (in addition to raising a procedural bar), so habeas relief is not allowed unless that decision was an unreasonable application of Crawford or other clearly established Supreme Court precedent.  There is reasonable support for the state court's decision that the testimony about the shots fired call and the reference to a white car were within the scope of the hearsay exception for the course of an investigation.  The same is true with respect to whether the statements were testimonial.  The statements were not made in a formal setting such as an interrogation or courtroom, and they came immediately on the heels of a citizen hearing gunshots and, with respect to the car, officers canvassing the neighborhood immediately after a body was found.  There is a reasonable basis to find that the statements were not testimonial under Crawford.  Petitioner has not met his heavy habeas burden on this claim.

**Ineffective Assistance of Counsel**

### A. Introduction; Strickland

Petitioner raises several claims that his trial attorneys, Pamela Smart and Larrion Hillman, rendered ineffective assistance.  To prevail on such a claim, Petitioner must establish that (1) his counsel's performance fell below an objective standard of reasonableness and (2) that, had counsel performed reasonably, there is a reasonable

probability that the result in his case would have been different.  Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

### B. Section 2254(d) Burden

Petitioner's Strickland claims were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold.  Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007).  The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it.  The federal court's review is thus "doubly deferential."  Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Id.  Thus, "even a strong case for relief  does not mean the state court's contrary conclusion was unreasonable."  Id.

### C. Review is Limited to State Court Record

Petitioner has filed various motions that seek to obtain discovery or otherwise enlarge the record with respect to his claims.  Review of a Strickland claim under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  It is reversible error for a federal

district court to hold a federal hearing to flesh out such a claim.  Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011).

### D. No Motion to Quash

Petitioner argues that his attorneys were ineffective because they did not file motions to quash the indictments based on the alleged defects in the grand jury proceeding and amendment of charges.  The underlying claims were addressed above.  The state court looked to an affidavit from counsel in which they testified that there were no grounds to quash.  The trial court agreed and added that the appellate court had reviewed the record on appeal and not noted any jurisdictional defects in the indictments.  Tr. 1723-24.

Petitioner has not demonstrated that Louisiana law would have required the quashing of his indictments if motions had been filed.  The state courts have reviewed the indictments and found them satisfactory, which is binding.  McKay v. Collins, 12 F.3d 66, 68-69 (5th Cir. 1994) ("Where the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue.").  Furthermore, there can be no showing of prejudice because any technical mistakes in the grand jury proceedings could have been easily remedied with new charges.  Pickney v. Cain, 337 F.3d 542 (5th Cir. 2003) (petitioner could not show Strickland prejudice based on no motion to quash indictment when a properly constituted grand jury would have also indicted based on the evidence).


### E. No Motion for Continuance

The Bossier Police Department finished transcribing a 123-page report regarding the Amy Foster crime scene on September 9, 2010, gave it to defense counsel on September 10, and jury selection started on September 13. Petitioner was represented by counsel on direct appeal, but he also filed a pro se brief. One of his pro se arguments was that the trial court erred when it did not require a timely disclosure of all such evidence. The appellate court found that neither the six-month delay for completing the lengthy report nor the one-day delay in forwarding it to counsel was unreasonable. State v. Jones, 81 So.3d at 251.

Petitioner argued in his postconviction application that trial counsel were ineffective because they did not ask for a continuance, on receipt of this report, so that they could locate and interview potential witnesses listed in the report. Petitioner argues that defense counsel could have used testimony from persons who told police they heard six to eight gunshots, four gunshots, or reported different times between 3:00 a.m. and 4:45 a.m. that they may have heard them. Petitioner notes that one witness said she saw a small two-door white vehicle in the area afterwards, and another said he saw a four-door brown Acura or Oldsmobile. Petitioner was reportedly driving a four-door silver Camry.

Defense counsel tendered an affidavit in the postconviction process and testified that they had certified the matter for trial months before the actual trial date, all reports were tendered with ample time to do all investigative work, and there was no need or basis for a continuance. Tr. 1795. The trial court credited the affidavit, noted the appellate court ruling that the delay in delivering the report was not unreasonable, and denied the claim on the merits. Tr. 1723.

Petitioner has not demonstrated that counsel would have been successful had they requested a continuance or that, if granted, there is a reasonable likelihood it would have changed the verdict. Counsel might have been able to interview some of the witnesses listed in the report, but their potential testimony about the time and number of gunshots would have done little but cement the fact that someone fired multiple shots in that area in the early morning hours before Amy Foster's body was found. Counsel might have made more of the testimony about the cars seen in the area, which did not match the description of the car he was driving, but the sighting of a white car in the area was not a big part of the prosecution's case. It is always possible that more evidence, some possibly helpful, could be gathered with more time, but Petitioner has not shown that the trial court's denial of this claim was an objectively unreasonable application of <u>Strickland</u>. That is particularly true when counsel testified in the state court proceedings that they were ready to go to trial and did not need a continuance.

## F. Conspiracy to Deter State Witnesses

Petitioner argues that his trial counsel "conspired to deter state witnesses" including crime lab analysts and a detective who issued a report about cell phone towers. Petitioner argues that the conspiracy was entered into to save the parish time and money. He contends that the crime lab analysts could have testified what was not found, such as Petitioner's fingerprints or DNA. He says that the analysts could have testified that Mark Lioy's blood or other DNA was not inside the car Petitioner drove, which he says is contrary to the State's theory that Petitioner shot Lioy seven times then transported and dumped his body. There

was speculation in one police report that the lack of blood in the body and at the scene suggested Lioy may have been murdered elsewhere and moved to the scene (Tr. 1364), but that theory was not advanced by the State at trial.

Counsel testified in their affidavit that there "was no conspiracy," and the suggestion that they consulted with the court and prosecutor about the State's witnesses was totally without merit. Counsel stated that the prosecutor has the discretion as to which witnesses he will call. If one of those witnesses would have been helpful to the defense, defense counsel would have called them. Tr. 1795-96. The trial court denied this claim on postconviction summarily and with the observation that the decision of which witnesses to call is a matter of trial strategy. Tr. 1724.

Petitioner has not pointed to any evidence in the state court record to support his assertion that there was a conspiracy between defense counsel and the prosecutor. There may have been stipulations, as there often are in criminal cases, to eliminate the need to call foundation or redundant witnesses, but Petitioner has not even pointed to specific evidence of this. There is also no basis for prejudice; the defense argument emphasized the lack of physical evidence to connect Petitioner to the crimes. It was within the ambit of trial strategy for defense counsel to not call a parade of witnesses to talk about what they did not find. Some attorneys might pursue that strategy, but others would elect not to because of the risk of angering jurors by dragging out the trial to make a point that required no witnesses.

Petitioner asserts that Detective Bruce Beltz could have testified, as he wrote in a report, that Petitioner's cell phone never made contact with a tower at the Lioy murder scene.

Beltz wrote that at 1811 hours Petitioner's phone pinged a tower at 1909 Alfred Lane, Bossier City, which is "the Barksdale Blvd. and Jimmy Davis Highway area." Tr. 1368. But Detective Bridges' trial testimony was similar. He said that the last contact in south Bossier from Petitioner's phone was in the Sligo Road area, which is in the same area mentioned by Beltz. The Alfred Lane tower and the entrance to Sligo Road are within about 2.5 miles of each other. Detective Bridges did not testify that Petitioner's phone ever connected to the Camp Joy Road tower. (The cell phone analysis located a phone only when it pinged a tower, such as when the phone placed or received a call or text. GPS tracking of the phone's every move was not available.) The State's theory was that Petitioner and his two companions were traveling together when they left the pawn shop, and the combination of their phone records indicated that they traveled together in the direction of the Lioy crime scene. Beltz's testimony would not have undermined that theory; it would have supported it.

The state court's rejection of this claim was brief, but "Section 2254(d) applies even where there has been a summary denial." Pinholster, 131 S.Ct. at 1402. A state court's determination, even a summary one, that a claim lacks merit precludes federal habeas relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786, quoting Yarborough v. Alvarado, 124 S.Ct. 2140 (2004). The complete lack of evidence to support the claim of a conspiracy, combined with the affidavit from counsel and the lack of showing of prejudice, provide a reasonable basis for the state court's decision. Habeas relief is not available on this claim.

### G.  No Competing Defense Experts

The State presented testimony from expert witnesses on issues of cell phone location and firearms/ballistics.  Petitioner argues that defense counsel were ineffective for not retaining their own experts in those areas and a DNA expert.  He argues that a DNA expert could have explained how unlikely it was that Petitioner could have shot Mark Lioy multiple times and transported his body to the cemetery without leaving DNA in the car, and how unlikely it was that Petitioner could have shot Amy Foster five times and stabbed her four times but not leave any trace of blood or DNA in the car he was driving.  He contends a cell phone expert could have explained that his phone never pinged in the sector where Lioy's body was found, and he argues that a bullet/firearms expert *might* show the possibility that one of the bullets recovered from Amy Foster was a .40 caliber and, thus, raise the argument that it was impossible for Petitioner to have fired two different caliber weapons into Foster.  The state court denied these claims summarily, with the observation that the decision of which witnesses to call is a matter of trial strategy.  Tr. 1724.

Petitioner has not identified a defense expert who could have been called on these issues, nor has he presented any evidence concerning what experts would have stated.  Such "unsupported claims regarding the uncalled expert witness are speculative and disfavored by [the Fifth Circuit] as grounds for demonstrating ineffective assistance of counsel."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).  Petitioner must also be able to show a reasonable probability that, but for counsel not hiring such experts, the jury would have had a reasonable doubt concerning Petitioner's guilt.  Id.  Petitioner cannot meet that burden

based on his mere speculation that there may be experts out there somewhere who might have helped. Allen v. Stephens, 619 Fed. Appx. 280, 287 (5th Cir. 2015) (no prejudice shown where there was no evidence that expert would have testified favorable to the defense).

Many of Petitioner's contentions about how experts might have helped are off the mark. For example, it was never claimed by the State that Petitioner's cell phone connected with the tower nearest Lioy's body. It was also not the prosecution's trial theory that Lioy was murdered inside the car or that his body was transported inside the car. And the possibility that an expert might have identified one of the bullets in Amy Foster as a different caliber would be, at most, of only marginal benefit to the defense.

Furthermore, Petitioner was represented by the Indigent Defender Board. If counsel wanted experts, state law would have required that they establish with a reasonable degree of specificity that expert assistance was required to answer a substantial issue or question or to support the critical element of the defense. State v. Lee, 879 So.2d 173, 176-77 (La. App. 1st Cir. 2004), citing State v. Touchet, 642 So.2d 1213 (La. 1994). The speculation offered by Petitioner is a far cry from the reasonable degree of specificity that must be shown to be entitled to an appointed expert. Petitioner has not demonstrated that counsel were ineffective for failing to request appointment of experts, and the state court's denial of this claim was not an objectively unreasonable application of Strickland. Guidry v. Cain, 2005 WL 1330133 (W. D. La. 2005) (Hill, M.J.) (rejecting Strickland claim based on lack of request for pathology expert because petitioner failed to identify an expert witness who would have

delivered testimony favorable to the defense); <u>Hansbro v. Cain</u>, 2006 WL 3488729 (W.D. La. 2006) (Hornsby, M.J.) (rejecting <u>Strickland</u> claim based on lack of request for DNA expert because petitioner did not show reasonable probability expert would have been of assistance).

### H. Failure to Interview Potential Witnesses

Petitioner argues that defense counsel should have interviewed the Mexican occupant of the house on Trichel Street who spoke to Detective Cleveland because he might have helped establish that Amy Foster was not in the Old Bossier area at the time shots were heard. Petitioner claims that police reports showed that Amy received a phone call from a drug dealer named Eddie to tell her that Mark Lioy had been shot execution style. Petitioner argues that Eddie should have been interviewed to determine how he became aware of the murder and why he believed it was necessary to tell Amy about it. The state court summarily denied this claim.

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 104 S.Ct. at 2066. But even if there has been defective performance, habeas relief is not warranted unless the poor performance caused prejudice—a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 104 S.Ct. at 2068. An applicant "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and

how it would have altered the outcome of the trial." <u>Gregory v. Thaler</u>, 601 F.3d 347, 352 (5th Cir. 2010) (quoting <u>U.S. v. Green</u>, 882 F.2d 999, 1003 (5th Cir. 1989)).

Petitioner has offered nothing but speculation that the Mexican resident and Eddie would have offered information helpful to the case. They were not eyewitnesses. They merely had some peripheral information about the events. Petitioner has not met his burden of showing that the state court's denial of this claim was an objectively unreasonable application of <u>Strickland</u>.

## I. Impeachment of Amber Thorn

Petitioner argues that counsel did not adequately impeach Amber Thorn by using her prior recorded statements to show inconsistencies by Thorn and coercion by police. Defense counsel established through cross-examination that Amber was questioned multiple times, and she admitted that questioning at the Bossier Police Station was "kind of aggressive" and the officers were "yelling at us and telling us we were lying when we were telling the truth, things like that." Tr. 750. Counsel also established that the officers threatened to hold Thorn in jail for 31 days, and they did before she agreed to testify.

Defense counsel also got Amber to admit that she had used "an excessive amount" of various drugs on the day of her alleged conversation with Petitioner about the plan to rob Mark Lioy. Counsel asked Amber if it was true that she had been questioned a few times before she offered the story about Petitioner inviting her to join in a robbery of Mark, and Amber said she did not remember. Counsel also pointed out to Amber that her aunt testified that Amber never told her anything about that conversation. Tr. 751-56.

Petitioner argues that counsel should have also used Amber's prior recorded statement given at the Shreveport Police Department to show that Amber originally claimed to not know anything about Mark Lioy owing Petitioner money and that Petitioner never talked to her about Lioy. Petitioner cites to a police report, but it is a summary of a statement that Amber gave at a Bossier sheriff's interview room, and the notes of that statement are consistent with Amber's testimony about the robbery plan. Petitioner claims that audio/video of an interview at the Bossier Sheriff's Office depicts Detectives Rawls and Owens screaming and threatening Amber that she would not leave until she told them everything, and she would spend the rest of her life in jail otherwise. Petitioner does not point to a copy of that alleged recording or a transcript anywhere in the record.

Defense counsel testified in their postconviction affidavit that they had access to all reports of initial interviews by Amber Thorn, as well as the transcript of her preliminary hearing testimony. Counsel testified that all of those statements were used at trial to cross-examine and impeach Amber. Counsel also said that they inquired during cross-examination about the alleged coercion and threats. Tr. 1798-99. The trial court credited the affidavit and found this claim meritless. Tr. 1725.

Counsel did cross-examine Amber Thorn and attempt to impeach her based on information related to her prior statements. Counsel may not have sought to introduce the entirety of any statement, but that may have been in an effort to avoid repeating Amber's incriminating statements before the jury. Counsel's performance was reasonable under the circumstances, and Petitioner cannot show prejudice stemming from the lack of introduction

into evidence of a prior statement.  <u>Smith v. Booker</u>, 2000 WL 122472 (5th Cir. 2000). There will almost always be things that a petitioner can point to that might have been done better or in a way more satisfactory to him, but at this stage of review even a strong case for relief under <u>Strickland</u> does not warrant setting aside a state court's decision.  Habeas relief is not available on this claim.

### J.  Conflict of Interest

Petitioner alleges that his attorneys came to him in jail and told him they had good news.  Petitioner was going to trial on two counts of second-degree murder because his attorneys had talked to the prosecutors and persuaded them to reduce the charges and take the death penalty off the table.  Petitioner alleges that he told counsel he would rather go to trial on two counts of first-degree murder, but counsel said that they wanted to proceed on second-degree murder, which would save the parish a lot of time and money.

Petitioner argues that this amounted to a conspiracy with prosecutors to reduce the charges.  He claims that he would have preferred to face first-degree murder charges and benefit from a unanimous verdict requirement.  But the jury likely would have been charged with the lesser responsive verdict of second degree murder that could be found based on a 10-2 vote.  <u>State v. Langley</u>, 958 So. 2d 1160, 1170 (La. 2007) ("Second degree murder ... is a responsive verdict to a charge of first degree murder."); La. C. Crim. Pro. Art. 782. Petitioner also complains that he filed numerous complaints with the bar association and a motion to withdraw counsel.

Trial counsel testified in their postconviction affidavit that they did everything possible to defend petitioner, including the filing of several motions for discovery, to suppress, for acquittal, to reconsider sentence, and the like. They said the assertion that they agreed to the lesser charges to save the parish time and money was totally without merit and that they believed avoiding a potential death penalty was acting in their client's best interest. Petitioner complained that his attorneys did not gather all available surveillance video and other information. Counsel testify that all available videos and materials were located and used to prepare a defense. They admitted that there were occasions when counsel and Petitioner did not have a meeting of the minds, and some interviews were terminated early to avoid confrontation. Such disagreements, however, did not affect counsel's ability to defend Petitioner, and they took into consideration everything he said. Tr. 1795-96, 1798-99. The trial court took note of the affidavit and denied the conflict-related claims. The court added that a disagreement on trial strategy does not amount to an actual conflict of interest. Tr. 1722, 1724.

Petitioner's conflict of interest contentions are governed by the standards of Strickland. Beets v. Scott, 65 F.3d 1258, 1265 (5th Cir. 1995)(en banc). Petitioner has not met his burden of showing that there was an actual conflict of interest, as opposed to a mere disagreement on certain strategies, and he has not demonstrated that any prejudice resulted. The state court's resolution of the conflict-related claims was a reasonable application of Strickland, not the kind of extreme malfunction to which habeas relief is limited. Petitioner asserts a separate issue that the trial court erred when it denied his motion to withdraw

counsel and replace them with attorneys from a different office. For these same reasons, the court's denial of that claim was also reasonable.

### K. No Objection to Hearsay From Griffith and Owens

Petitioner argued, in an issue discussed above, that Detectives Griffith and Owens wrongfully offered hearsay testimony about the complaints of "shots fired" and what some witnesses told officers when they canvassed the area after finding Amy Foster's body. That claim was rejected because, in part, the Louisiana Rules of Evidence allow an investigating officer to refer to such statements made during the course of his investigation to explain the steps that led to the arrest. Petitioner now complains that counsel were ineffective because they did not object to this testimony.

Counsel testified in their affidavit that they believe such statements were not considered hearsay under the rules, and they added that cross-examination of the persons who made the statement would have afforded no benefit to the defense. Tr. 1800. The state court accepted the affidavit and added that whether to object is often a strategic decision. Tr. 1722-23. Such an objection would have been of questionable merit, given the Louisiana evidence rule cited above, and counsel are not required to raise every possible objection to avoid being labeled constitutionally incompetent. Their actions were sufficiently reasonable that the state court's denial of this claim was a reasonable application of Strickland.

### L. No Objection to Vasquez Statement

#### 1. Introduction

Benito Vasquez, who had been in jail with Petitioner, gave a recorded statement to

investigators about four months before trial and said that Petitioner admitted to him that he killed the two victims. When Vasquez was called to testify at trial, with only a few days remaining on his sentence, he said he remembered giving the past statement, but when he was asked if he had "a recollection" of the statement he said no. He also testified that the prior statement was not true and that he had made it up based on newspaper and TV reports because he was, "Trying to get out of jail." The prosecutor then played Vasquez's prior statement for the jury. Tr. 863-71. Vasquez told the prosecutor that he refused to testify against Petitioner because "Y'all didn't do anything for me." Tr. 876.

### 2. Prejudicial Statements

Petitioner argued on postconviction that trial counsel were ineffective for not objecting to the admission of the prior statement. Petitioner conceded that his counsel had succeeded in having the statement edited to remove some prejudicial comments, such as Vasquez's statement that Petitioner had killed other people, but Petitioner complained that the statement still included comments that Petitioner was a "pretty dangerous fellow," should not be trusted, and would kill someone without thinking twice.

Trial counsel stated in their postconviction affidavit that they agreed to the edited statement because they "wanted the conflicting statement played so the jury knew that [Vasquez] had lied on at least one occasion." Tr. 1799. The state court denied the claim on the grounds that whether to object is a strategic decision vested in counsel, and an objection would have been meritless. Tr. 1722-23. Some attorneys may have asked to edit out some of the other comments, but a lack of insistence on further editing of the statement does not

render the state court's decision of this claim an objectively unreasonable application of Strickland. Reasonable minds might differ on how the matter should have been handled, but that is not enough to warrant habeas relief.

### 3. Prior Statement as Substantive Evidence

Petitioner devoted one sentence of his postconviction application to the argument that counsel were ineffective for not objecting to the playing of Vasquez's prior recorded statement on the grounds that Vasquez rendered it inadmissible when he admitted making it. Petitioner cited State v. Taylor, 593 So.2d 431 (La. App. 2d Cir. 1992), a case in which a witness admitted making a prior inconsistent statement. The appellate court held that the witness's admission to inconsistency accomplished the impeachment. And [o]nce [the witness's] impeachment had been accomplished, the narration or transcript of his prior inconsistent statement was *not* admissible over [the defendant's] objection."[1]

Petitioner's federal habeas memorandum leads off with the same one-sentence argument and citation to Taylor but does not further develop the argument. At the time of Taylor in 1992, Louisiana followed the rule that prior inconsistent statements "simply do not constitute substantive evidence." State v. Owunta, 761 So.2d 528, 529 (La. 2000). But Louisiana law had changed by the time of Petitioner's trial in 2010. A 2004 amendment to

---

[1] Taylor cited L.C.E. art. 613, which states that extrinsic evidence of prior inconsistent statements is admissible after the proponent has first fairly directed the witness's attention to the statement, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so. See also L.C.E. art. 607(D)(2) (allowing extrinsic evidence of prior inconsistent statements when offered solely to attack credibility).

L.C.E. art 801(D)(1) revised it to provide: "A statement is not hearsay if... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is: (a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement."

Louisiana courts interpreted this change to mean that, since 2004, "[p]rior inconsistent statements may constitute substantive non-hearsay evidence admissible for their assertive content when the declarant appears at trial and 'there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement.'" State v. Ayo, 167 So. 3d 608, 614 (La. 2015); State v. Rankin, 965 So.2d 946, 950 (La. App. 2d Cir. 2007) (prior statements to police by witness admissible to attack credibility and for "assertive value" after she recanted at trial); State v. Fontenot, 207 So.3d 589 (La. App. 3rd Cir. 2016) (same).

This argument was presented on postconviction as claim 1.J, "Fail[ure] to object to the trial court admission of Benito Vasquez edited statement." Tr. 1193-95. The state court generally denied the claim, along with several other failure to object claims, on the grounds that objection decisions are a matter of strategy vested to counsel, and the affidavit of trial counsel persuaded the court that the objections sought were meritless or unfounded. Tr. 1722-23. The court found that none of the several alleged mistakes of counsel were less than competent performance, and it added in the alternative that Petitioner had not met his burden of showing prejudice. Tr. 1725.

The court reads the state court's decision to deny this claim on the merits, and "Section 2254(d) applies even where there has been a summary denial." <u>Pinholster</u>, 131 S.Ct. at 1402. Petitioner has the burden under Section 2254(d) of showing that there was "no reasonable basis" for the state court's decision. <u>Pinholster</u>, 131 S.Ct. at 1402, citing <u>Richter</u>, 131 S.Ct. at 786. Given the Louisiana evidence law at the time of trial, counsel did not render incompetent performance by not objecting. There was corroborating evidence of guilt in the form of the cell phone records, testimony of Amber Thorn, and other evidence discussed above, so the Vasquez statement was admissible as substantive evidence. Furthermore, any prejudice stemming from a lack of objection was tempered by a limiting instruction to the jury regarding the use of such statements.[2] Under these circumstances, and considering that Section 2254(d) reaches only extreme malfunctions in the state criminal justice system, relief is not available on this claim. The state court's decisions was a reasonable application of <u>Strickland</u> to the relevant facts.

## M. Failure to Investigate Mental Health Defense

Petitioner argues that counsel should have pursued a defense based on his advising them that he had been diagnosed as a paranoid-schizophrenic and prescribed medication

---

[2] The court did not give a contemporaneous limiting instruction regarding the use of the prior statement. But, to the benefit of the defense, the final jury instructions included: "The testimony of a witness may be discredited by showing that the witness made a prior statement which is inconsistent with his present testimony. Prior contradictory statements are admitted only to attempt to discredit the witness and not to show that the contradictory statements are true." Tr. 1023.

when he was serving time for an earlier conviction.[3]  Petitioner represents that one of his attorneys said that the other attorney was having "a little situation with her investigator," so they had no record of the illness.  Petitioner faults counsel for not doing more to pursue a possible defense.

Counsel testified in an affidavit that a sanity commission was appointed to evaluate Petitioner, and it concluded that he had no mental defect and was competent to proceed.  Tr. 1800.  The state court considered that testimony and held that the allegations were not sufficient to meet the performance or prejudice prongs of Strickland.  Tr. 1721-22.  The record does not support Petitioner's contention that counsel did not explore this defense, and the state court's decision of this claim was quite reasonable.

## N.  No Objection to Prison Record Evidence

Petitioner was held in jail as he awaited trial.  State witness Marcus Lige mentioned in his testimony that he was housed in the Bossier jail with Petitioner, and the recorded statement of Benito Vasquez included a statement that he was then being housed with Petitioner.  Petitioner argues that his attorneys should have objected and excluded references to his "prison record."  The state court summarily rejected this claim.  Tr. 1722-23.

Both witnesses were in jail when they met Petitioner, and that context was important to their testimony.  Defense counsel likely wanted to emphasize that point to attack the

---

[3] The record shows that Petitioner was convicted as a juvenile of attempted second degree murder in connection with an attempt to rob a Byrd High School student that ended with Petitioner shooting the student four times.

credibility of the witnesses on grounds they were attempting to curry favor with the prosecutor and get out of jail. A Louisiana court has denied mistrial when a prosecutor himself mentioned that the accused had been in jail for two years but did not refer to another crime. State v. Williams, 902 So.2d 485, 493-94 (La. App. 5th Cir. 2005). And it was noted in Williams and State v. Santos, 40 So.3d 167, 175 (La. App. 5th Cir. 2010)—where a witness mentioned the defendant had been in jail—that it was not unreasonable for the jury to assume that a defendant charged with multiple serious crimes would be incarcerated pending trial.

It is almost certain that any objection by counsel to exclude all references to the relevant conversations happening in jail would not have been successful. The lack of a meritless objection is not ineffective assistance. Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002); Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994). And if counsel had not attacked the witnesses' credibility based on their incarcerated status, Petitioner would likely fault them for that. The state court's denial of this claim was reasonable.

### O. False Affidavit by Trial Counsel

Petitioner's trial attorneys submitted an affidavit in the postconviction proceeding to respond to the attacks on their performance. Petitioner argues that the affidavit contains false statements, and he complains that the trial court based its ruling on the contents of the affidavit without conducting a hearing to allow Petitioner to explore the testimony.

As noted above, the federal habeas court does not sit to correct procedural errors alleged to have been committed in the postconviction process. The courts have rejected

habeas claims that the state court should have held an evidentiary hearing on a postconviction application.  Mathis v. Dretke, 124 Fed. Appx. 865, 871-72 (5th Cir. 2005).  There is no requirement that the state court hold a full and fair hearing before it denies a postconviction application, and the federal court applies a presumption of correctness to state court findings even absent such a hearing.  Id., citing Valdez v. Cockrell, 274 F.3d 941, 949 (5th Cir. 2001).  Petitioner is not entitled to habeas relief from his convictions based on this claim.

**Ineffective Assistance of Appellate Counsel**

Attorney Lee Harville was appointed to represent Petitioner on appeal, and he filed a brief and participated in oral argument.  Petitioner argues that Harville was ineffective because he did not obtain a complete trial transcript, did not make oral argument with regard to the pro se arguments briefed by Petitioner, and did not pursue an ineffective assistance of trial counsel claim on direct appeal.  The state court denied this claim because Petitioner offered only a conclusory assertion that the transcript was incomplete, the appellate court reviewed all of the pro se arguments in its written decision, and the general rule in Louisiana is that ineffective assistance of trial counsel claims are more properly raised on a motion for postconviction relief rather than on direct appeal.  Tr. 1725-28.

Effective assistance of appellate counsel does not require counsel to raise every non-frivolous ground of appeal available.  It requires only that counsel perform in a reasonably effective manner.  Green v. Johnson, 160 F.3d 1029, 1043 (5th Cir. 1998), citing Evitts v. Lucey, 105 S.Ct. 830 (1985).  When a petitioner claims that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was

a reasonable probability that he would have won on appeal. <u>Smith v. Robbins</u>, 120 S.Ct. 746, 764 (2000); <u>Moreno v. Dretke</u>, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner did not identify a meritorious issue that might have been raised based on the allegedly missing parts of the transcript. As for oral argument, effective assistance of appellate counsel does not require that the argument address every issue raised in the briefs. Effective arguments often choose to focus on the stronger arguments or those to which the panel directs the attorney. And Petitioner cannot show prejudice from the lack of such argument; his pro se claims were fully addressed in the appellate decision. Turning to the ineffective assistance claims, counsel could have attempted to assert them on direct appeal, but it is likely that the appellate court would have deferred them to the postconviction process.[4] In any event, there was no prejudice because Petitioner still had an avenue to litigate claims of ineffective assistance, and he did. The state court's denial of these claims was reasonable.

**Conclusion**

Petitioner has raised several claims for habeas relief. The state courts previously addressed all of them on the merits, either on direct appeal or postconviction. Petitioner takes issue with those decisions, but this court does not review them de novo. When properly

---

[4] "The appropriate avenue for asserting a claim for ineffective assistance of counsel is through postconviction relief, not by direct appeal." <u>State v. Truitt</u>, 500 So.2d 355, 359 (La. 1987). But the rule is not without exception. When "the record discloses evidence needed to decide the issue," an appellate court may decide it. <u>State v. Peart</u>, 621 So.2d 780, 787 (La. 1993).

reviewed under the demanding Section 2254(d) standard, it cannot be said that any of the state court's final decisions were an unreasonable application of clearly established federal law.  Petitioner particularly complains about his former attorneys.  One can always argue after a trial for how things might have been done better, but the Sixth Amendment guarantees only reasonable competence of counsel, "not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 124 S. Ct. 1, 6 (2003).

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 25th day of August, 2017.

Mark L. Hornsby
U.S. Magistrate Judge